**Affirmed as Modified and Opinion filed September 16, 2014.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-13-00325-CV

---

### SABA ZI EXPLORATION, LP, Appellant

### V.

### LANE VAUGHN, TERRY SELLAND, AND FORT PECK OIL & GAS, L.L.C., Appellees

---

**On Appeal from the 55th District Court
Harris County, Texas
Trial Court Cause No. 2008-74745B**

---

## O P I N I O N

This case turns on the interpretation of a settlement agreement governing the distribution of funds following the sale of certain mineral leases. After the sale of the leases, appellant Saba Zi Exploration, L.P., a party to the settlement agreement, filed an interpleader action regarding the proceeds, and appellees Lane Vaughn, Terry Selland, and Fort Peck Oil & Gas, L.L.C. (collectively "Vaughn"), also signatories, filed a counterclaim, alleging that Saba Zi's proposed distribution

breached the agreement.[1]   After a trial to the bench, the court ordered Saba Zi to deposit $562,957 into the registry of the court and assign Vaughn an overriding royalty interest in the mineral leases of 1.64%.

On appeal, as in the trial court, the parties principally dispute whether the terms of the settlement agreement permitted certain alleged expenses to be deducted from the sale proceeds by Saba Zi before distribution to Vaughn and the conveyance of overriding royalty interests to third parties.  In three issues, Saba Zi contends that (1) the trial court inaccurately interpreted the settlement agreement, (2) the trial court erroneously placed the burden of proof on Saba Zi to disprove Vaughn's allegations, and (3) the evidence is legally and factually insufficient to support the trial court's judgment.  We modify the trial court's judgment to change the amount of the overriding royalty interest assigned to Vaughn from 1.64% to .82%, and as so modified, we affirm.

## I.   Background

In the original dispute among these parties and others, Vaughn claimed an instrumental role in helping Saba Zi obtain mineral leases in the Bakken shale formation in eastern Montana and a consequent entitlement to an interest in those leases.[2]   Saba Zi denied Vaughn had a right to any such interest.  The parties settled their dispute in a Rule 11 agreement signed on August 12, 2010.  Under the terms of this agreement, Vaughn was to receive two types of "economic benefit"

---

[1] The settlement agreement, as well as the trial court's orders in this case, treated appellees collectively as "Vaughn."  Because no distinction is made between any of these parties in this appeal, we will adopt the convention used below and also refer to them collectively as "Vaughn."

[2] The lawsuit was initiated by Gulf Coast Prospectors, Inc., seeking declaratory judgment as to Vaughn's rights in the leases.  Vaughn counter-claimed and filed third party claims against Saba Zi, among others.  As will be discussed, all of the original claims were settled, leaving only the interpleader claims and related counter-claims.  The record on appeal does not contain pleadings filed prior to the interpleader petition.

from Saba Zi in exchange for releasing Vaughn's claims: "41% of any Distributable Cash (as defined in Article VI of the Saba Zi Exploration Limited Partnership Agreement) payable to the TBG, Bakken, LLC ('TBG')[3] from the sale of the 31,273 acres, . . . and 41% of any Retained Royalty Interest retained or granted to TBG (as defined in Article VI of Saba Zi Exploration Limited Partnership Agreement)."[4] This agreement was subsequently incorporated in and attached to a brief mutual release of all claims.

On April 5, 2012, Saba Zi filed an interpleader petition with the trial court.[5] In its petition, Saba Zi stated that the mineral leases had been sold and it was ready to distribute settlement proceeds and the retained overriding royalty interests.[6] Saba Zi further offered to deposit into the court's registry $255,101.10 and convey an overriding royalty interest of .82% to Vaughn. Saba Zi sought a release and discharge of all liabilities in the matter as well as attorney's fees. Vaughn answered and filed a counterclaim, alleging Saba Zi breached the contract and seeking an accounting.

The trial court held a one-day bench trial during which only one witness

---

[3] TBG is identified as Saba Zi's "Founder Partner" in the Limited Partnership Agreement. Although the settlement agreement expressly states that Vaughn was not to receive any type of interest in Saba Zi, TBG, or any other entity, the calculation of his economic benefits were directly tied to what TBG was to receive from the sale of the mineral rights.

[4] Under the agreement, Vaughn was also to receive a $50,000 payment from another party upon signing of the mutual releases. This payment was apparently made and is not at issue in this appeal.

[5] A law firm that had previously represented Vaughn in the matter filed a plea in intervention seeking a share of Vaughn's recovery. Vaughn crossclaimed, asserting his discharge of the law firm was for cause and, therefore, the firm was not entitled to any recovery. These claims, however, were severed from the interpleader action, which was then rendered final and appealable.

[6] The period of time between the signing of the settlement agreement and the filing of the interpleader petition was occupied in part by efforts to find a buyer for the mineral rights and to close the sale. The terms of the sale were reportedly confidential, so we will not discuss the details in this opinion.

3

testified—Saba Zi's representative, Brian Burr—and only a few documents were admitted as exhibits.[7] The court and the parties initially discussed which side was required to put on their case first, with the court ultimately deciding Saba Zi had the burden. The only disputes presented at trial for the court's determination were what expenses Saba Zi was entitled to deduct from the sale proceeds before distribution and whether Saba Zi could convey overriding royalty interests to third persons before calculating the interest to be conveyed to Vaughn.

Specifically regarding the expenses, Vaughn challenged Saba Zi's right to deduct $600,000 it listed as "capital raise" (essentially repayment of funds from investors along with a 100% return on those funds) and another $500,000 it reported as a management fee.[8] As to the overriding royalty interests, Saba Zi asserted that it conveyed a 1% interest each to the Campbell Group and Bob Burr (Brian Burr's father) for services it otherwise could not have afforded given its financial condition. In an order issued after trial, presenting the court's findings and holdings, the court rejected Saba Zi's request to deduct the $600,000 "capital raise" and permitted it to deduct only $350,000 of the claimed $500,000

---

[7] Although Brian Burr did not testify in detail regarding his relationship to Saba Zi, an affidavit he previously filed with the trial court identified him as the managing member of the partnership that acted as Saba Zi's general partner. He is also listed on the signature page of Saba Zi's Limited Partnership Agreement as the president of each of Saba Zi's other partners, including TBG.

[8] The management fee was actually owed by Saba Zi's "Investment Limited Partner," DCB Capital, LP to its own general partner. Because of the way the settlement agreement calculated the amount Vaughn was entitled to receive, Saba Zi was permitted to deduct such fees before determining Vaughn's distribution. As will be discussed, the $500,000 claim was for management fees during a particular period of time and does not represent the entirety of management fees paid by Saba Zi or deducted from the distribution to Vaughn.

As set forth above, the settlement agreement capped historic costs at $4.5 million. According to a spreadsheet produced by Saba Zi and admitted at trial, this historic cost figure was in fact reached. The $600,000 "capital raise" and $500,000 management fee were listed on the spreadsheet as post-settlement costs, in addition to $329,645 in post-settlement costs on which Vaughn made no objection.

4

management fee. The court further rejected Saba Zi's request to convey an overriding royalty interest to the Campbell Group and Bob Burr. Ultimately, the trial court ordered that Vaughn was entitled to receive $562,957 and an overriding royalty interest of 1.64% from Saba Zi. The court further granted attorney's fees ($11,300) and costs to Saba Zi for its interpleader action and discharged it from the suit. This appeal followed.

## II. Burden of Proof

In its second issue, Saba Zi contends that the trial court erred in assigning it the burden of proof at trial. In its order, the trial court stated "The Court rules that Saba Zi has the burden of proving that its expenses were in compliance with the agreements." Because resolution of this issue may impact our analysis of the substantive issues, we will consider it first.

According to Saba Zi, the real issues in this case all stem from Vaughn's breach-of-contract counterclaim, and thus, Vaughn should have borne the burden. In response, Vaughn asserts that Saba Zi properly had the burden of proof because (1) it was the plaintiff in the interpleader action and (2) it possessed peculiar knowledge regarding the key facts in the case, which principally concerned Saba Zi's expenses and accounting therefor. Vaughn additionally argues that even if the court erred in assigning the burden of proof, any such error was harmless.

We begin by noting that Vaughn's first suggestion is incorrect. The issues tried in the bench trial were related to Vaughn's breach-of-contract counterclaim, not Saba Zi's interpleader action. An interpleader plaintiff is entitled to relief if three elements are met: (1) it is either subject to, or has reasonable grounds to anticipate, rival claims to the same fund or property[9]; (2) it has not unreasonably

---

[9] Saba Zi filed its interpleader action because both Vaughn and his former counsel claimed interests in the proceeds and retained royalty interests after the leases sold. *See supra*

5

delayed filing the action in interpleader; and (3) it has unconditionally tendered the fund into the registry of the court. *Olmos v. Pecan Grove Mun. Util. Dist.*, 857 S.W.2d 734, 741 (Tex. App.—Houston [14th Dist.] 1993, no writ). None of these issues were tried to the court in the proceeding now on appeal. Instead, the issues at trial all concerned whether Saba Zi had properly deducted certain expenses from the amount it offered to place in the court's registry and properly calculated the royalty interest to be conveyed: issues raised only in Vaughn's breach-of-contract counterclaim.[10] Put simply, Vaughn was seeking affirmative relief for Saba Zi's alleged actions. A party who asserts an affirmative claim for relief generally has the burden of persuading the factfinder as to each element of his cause of action. *See Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 482 (Tex. 1984).[11]

In the second suggestion, Vaughn contends the trial court properly assigned the burden to Saba Zi because it possessed "peculiar knowledge" of the facts in dispute. Courts have used this theory to shift the burden on particular issues under particular circumstances. *See, e.g., Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 272 (Tex. App.—Amarillo 1988, writ denied)

---

n.5.

[10] The elements of a breach of contract cause of action are (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach. *West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

[11] This issue often arises in declaratory judgment cases, where it is firmly established that the party asserting an affirmative claim bears the burden of proving its allegations. *See, e.g., Apache Corp. v. Dynegy Midstream Servs., Ltd. Partnership*, 214 S.W.3d 554, 564 (Tex. App.—Houston [14th Dist.] 2006), *aff'd in part, rev'd in part on other grounds*, 294 S.W.3d 164 (Tex. 2009); *Russell v. City of Bryan*, 919 S.W.2d 698, 704 (Tex. App.—Houston [14th Dist.] 1996, writ denied); *see also Pace Corp. v. Jackson*, 155 Tex. 179, 194, 284 S.W.2d 340, 350 (1995) (holding that defendant in declaratory judgment action had burden of proof where he sought relief through breach of contract counterclaim and plaintiff merely sought construction of the contract).

(holding party that completed wells in a manner which created allocation and ownership problems should bear burden of proof as to those issues because it possessed "peculiar knowledge" of the facts); *Dessommes v. Dessommes*, 505 S.W.2d 673, 679-80 (Tex. Civ. App.—Dallas 1974, writ ref'd n.r.e.) (holding "considerations of fairness, convenience and policy require[d] imposition of the burden on the former husband to prove what portion of the commingled retirement fund [wa]s attributable to contributions of his separate property[, as t]he commingling of funds was the result of his acts rather than" the wife's). We do not agree, however, that the circumstances of this case require application of this theory here.[12] The question of whether Saba Zi properly deducted expenses and calculated Vaughn's share was not a discrete issue in this case but was at the heart of Vaughn's breach-of-contract allegations. Moreover, unlike in *Raw Hide*, *Dessommes*, and similar cases, there is no allegation that Saba Zi did anything to render proving the propriety or impropriety of the expenses difficult. *See Raw Hide Oil & Gas*, 766 S.W.2d at 272 (explaining party completed wells in a manner which created allocation and ownership problems); *Dessommes*, 505 S.W.2d at 679-80 (explaining husband comingled retirement funds). Although much of the information needed to show a breach of contract would have been in Saba Zi's possession, there is no allegation that such information would not have been discoverable through the normal discovery process. *See* Tex. R. Civ. P. 190.1-215.6.

Accordingly, we conclude the trial court erred in assigning the burden of proof to Saba Zi to disprove Vaughn's breach-of-contract allegations. However, under Texas Rule of Appellate Procedure 44.1(a), we may not reverse the trial court's judgment unless that error probably (1) caused the rendition of an improper

---

[12] We further note that this theory was not discussed below as a reason for shifting the burden of proof.

7

judgment or (2) prevented Saba Zi from properly presenting the case on appeal. Tex. R. App. P. 44.1(a); *see also Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005). In other words, we will not reverse unless harm resulted from the error. *See, e.g., Klentzman v. Brady*, No. 01-11-00765-CV, 2013 WL 5655845, at *13 (Tex. App.—Houston [1st Dist.] Oct. 17, 2013, no pet.).

Although Saba Zi states generally that "[f]ew errors are of greater importance than errors regarding which party bears the burden of proof," it does not provide any argument as to how it was harmed by the court's alleged error under the circumstances of this case. Trial court error in assigning the burden of proof can be determined to be harmless under appropriate circumstances. *Compare In re K.K.*, No. 2-04-269-CV, 2006 WL 133506, at *2 (Tex. App.—Fort Worth Jan. 19, 2006, no pet.) (mem. op.) (holding trial court's error in placing burden of proof on defendant in de novo appeal from associate judge's ruling was harmless where defendant did not contend he was prevented from developing all of the relevant facts and it did not appear that defendant suffered any injury on account of this error), *and Tex. Real Estate Comm'n v. Sandefur*, 279 S.W.2d 954, 955 (Tex. Civ. App.—Fort Worth 1955, no writ) (holding court's possible error in assigning burden of proof was harmless where appellant did not contend it was prevented from developing all of the facts and it did not appear that appellant suffered any injury on account of this error), *with FPL Farming Ltd. v. Envtl. Processing Sys., L.C.*, 383 S.W.3d 274, 285 (Tex. App.—Beaumont 2012, pet. granted) (holding error in assigning burden of proof was harmful where the issue in question was hotly contested and party "used the error to its advantage in final argument"), *and Bargsley v. Pryor Petroleum Corp.*, 196 S.W.3d 823, 830 (Tex. App.—Eastland 2006, pet. denied) (holding error in assigning the burden of proof on critical issue was harmful where "jury easily could have thought that neither

8

side could prove th[e] issue").

As will be discussed in detail below, resolution of the disputed issues in this case largely revolves around construction of the settlement agreement between the parties and sections of Saba Zi's Limited Partnership Agreement (as incorporated into the settlement agreement) as well as the trial court's assessment of the only witness's testimony. We will therefore make our determination regarding possible harm injected by the use of the wrong burden of proof as we discuss each of the disputed issues.[13]

### III. Contract Construction and Evidence

In its first issue, Saba Zi contends that the trial court improperly interpreted the settlement agreement. In its third issue, Saba Zi challenges the legal and factual sufficiency of the evidence to support the trial court's judgment.

### A. Standards of Review

The construction of an unambiguous written contract is a question of law for the court. *See Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006). Whether a contract is ambiguous is also a question of law; one that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered. *Anglo–Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 449–50 (Tex. 2011). When construing a contract, we must ascertain the true intentions of the parties as expressed in the writing itself. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333–34 (Tex. 2011). In identifying the intention of the parties, we examine and consider the entire writing in an effort to harmonize and give effect to all the

---

[13] As will be shown, we ultimately overrule Saba Zi's second issue because we cannot discern any harm resulting from the trial court's error in assigning Saba Zi the burden of proof in this case.

provisions of the contract so that none will be rendered meaningless. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). If, after the rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law; on the other hand, an agreement is ambiguous, creating a fact issue on the parties' intent, if it is susceptible to more than one reasonable interpretation. *See Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 38-39 (Tex. 2012).

We begin our analysis with the contract's express language. *Italian Cowboy Partners*, 341 S.W.3d at 334; *see also Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law."). Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co.*, 164 S.W.3d at 662.

Where the parties have entered into an unambiguous written contract, the instrument alone will be deemed to express the intention of the parties because it is the objective intent, not subjective intent, that controls. *Matagorda Cnty. Hosp. Dist.*, 189 S.W.3d at 740. An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports. *Anglo–Dutch Petroleum*, 352 S.W.3d at 451. The parol evidence rule, however, does not prohibit consideration of surrounding circumstances that inform rather than vary from or contradict the contract text, including the commercial or other context in which the contract was executed. *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011).

10

When reviewing for legal sufficiency, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827. If there is more than a scintilla of evidence to support the finding, the legal-sufficiency challenge fails. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). The trial court acts as the factfinder in a bench trial, and it is the sole judge of the credibility of witnesses and the weight to be given their testimony. *E.g., Zagorski v. Zagorski*, 118 S.W.3d 309, 318 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

### B. Analysis

As set forth above, the parties contest two cost deductions Saba Zi requested—for a $500,000 management fee and a $600,000 "capital raise"—as well as Saba Zi's conveyance of a 1% retained overriding royalty interest each to the Campbell Group and Bob Burr. In general, Saba Zi contends that in construing the agreement, the trial court ignored the plain meaning of the settlement agreement and instead relied on the argument of Vaughn's counsel. We will discuss each disputed item in turn.

### 1. $500,000 Management Fee

The trial court found that Saba Zi could validly deduct $350,000 of the management fees claimed after the date of settlement, but that $150,000 of the fees should be disallowed. The court based this calculation on its interpretation of

11

Brian Burr's testimony that the management fee was $25,000 a month and that work to sell and market the mineral leases continued through September 2011.[14] The court then determined that the time from the date of settlement (August 2010) to the date closing work concluded (September 2011) was fourteen months and multiplied that number by the amount of the appropriate management fee to get the $350,000 permissible total (14 x $25,000 = $350,000). In making this calculation, the trial court appears to have concluded that under the terms of the settlement agreement, post-settlement fees had to be reasonable and necessary in order to be deducted. Saba Zi disagrees.[15]

According to Saba Zi, under a proper interpretation of the settlement agreement, it was entitled to deduct all management fees, without limitation. The basis of Saba Zi's contention rests in the fact that paragraph 2 of the settlement agreement, establishing the amount Vaughn was to receive from the sale of the mineral rights, incorporates Article VI of Saba Zi's Limited Partnership Agreement. Saba Zi contends that Article VI allows management fees to be deducted before the amount of cash distributions is calculated and, thus, the management fees were not subject to the settlement agreement's "reasonable and necessary" requirement.

---

[14] The trial court appears to have been somewhat generous with Burr's testimony. Burr actually testified in support of a management fee at $250,000 per year, which is $20,833.33 per month, not $25,000 as stated by the court in its findings. This generosity accrued to Saba Zi's benefit, however, and Vaughn does not complain on appeal. *See Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998) (explaining that an appellate court cannot reverse a trial court's judgment on unassigned error); *Bishop v. Miller*, 412 S.W.3d 758, 773 n.17 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (same). Burr also testified, and the trial court found, that $250,000 was a reasonable and necessary fee, but as will be explained below, the accuracy of this statement is not vital to the question of whether fees were properly deducted.

[15] Saba Zi also argues the management fees were not subject to the agreement's $4.5 million pre-settlement cap on expenses, but since the $500,000 in disputed fees at trial was undisputedly incurred post-settlement, this argument is inapposite to the analysis.

In relevant part, paragraph 2 states,

> Vaughn shall receive 41% of any Distributable Cash (as defined in Article VI of the Saba Zi Exploration Limited Partnership Agreement) payable to [TBG] from the sale of the 31,273 acres, after and subject to all expenses, debts, and indemnity obligations that Saba Zi is obligated to pay under its partnership agreement to be capped at $4.5 million in historic costs and subject only to further future reasonable and necessary expenses needed to market and/or sell the leases.[16]

And, Article VI of Saba Zi's Limited Partnership Agreement states in relevant part:

## ARTICLE VI
## DISTRIBUTIONS

Section 6.1. <u>Distributable Cash</u>. Except as otherwise provided in Article XIII hereof, and subject to the limitations contained in Section 6.4 hereof, the General Partner shall determine the amount of Net Cash Flow, if any, at the end of each Fiscal Quarter. Not later than the thirtieth (30th) day after the end of each Fiscal Quarter, the General Partner will cause the Partnership to distribute the Net Cash Flow to the Partners as follows:

(a) First, to the Investment Limited Partner until the cumulative amount distributed to the Investment Limited Partner under this subparagraph 6.1(a) after any withholding under Section 6.3 of this Agreement is equal to the sum of (i) the aggregate Capital Contributions by the Investment Limited Partner; (ii) the amount necessary for the Investment Limited Partner to maintain a reserve against future expenses which together with all other reserves for such purposes shall be equal to $250,000; **(iii) the management fees payable by the Investment Limited Partner to its general partner with respect to any amounts distributed to the Investment Limited Partner**; and (iv) the amount, if any, of all distributions to be made by the Investment Limited Partner to

---

[16] As mentioned above, in using the term "Vaughn," the settlement agreement referred to the appellees collectively. *See supra* n.1.

its general partner or otherwise that have priority over distributions by the Investment Limited Partner to the limited partners of the Investment Limited Partner on a prorate basis.

(b) The balance, if any, to the Partners in accordance with their Percentage Interest at the time of such distribution.

(Emphasis added.)

Under Saba Zi's interpretation, the limitations contained in paragraph 2 of the settlement agreement (including the requirement future expenses be reasonable and necessary to market or sell the leases) do not apply to the management fees referenced in Article VI, as they are deducted before the amount of Distributable Cash is calculated. According to Saba Zi, the paragraph 2 limitations only apply to expenses taken after the amount of Distributable Cash is calculated.

The Vaughn Parties posit instead, and the trial court appears to have agreed, that the management fees incurred post-settlement relate to the marketing and selling of the leases and, as such, they can only be deducted under the settlement agreement if they are reasonable and necessary. We conclude that the management fee is an expense to be paid under the partnership agreement rather than the settlement agreement and, as such, is not bound by the requirements of paragraph 2.[17] However, we do not agree there are no limitations to the amount that may be claimed as a management fee; nor do we agree that the judge's order disallowing $150,000 of the management fees is in error.

Saba Zi contends that there was no evidence at trial that the additional

---

[17] Paragraph 2 mentions "expenses, debts, and indemnity obligations that Saba Zi is obligated to pay under its partnership agreement," but Article VI states that the management fee is an obligation *the Investment Limited Partner* owed to its general partner and which was to be included in the calculation of the Investment Limited Partner's share of Distributable Cash, which was deducted before TBG's (and hence Vaughn's) share was calculated. Thus, the management fees were not an expense, debt, or indemnity obligation that Saba Zi was itself required to pay, and the limitations in paragraph 2 do not apply.

14

$150,000 in management fees was not properly deducted for the post-settlement period. But, as the court explained in its findings, and we set forth above, Burr testified that the management fee was $250,000 a year and that work continued on the sale and post-closing matters for approximately fourteen months after settlement. The evidence therefore supports the trial court's reducing the allowable management fees from $500,000 to $350,000.[18] Additionally, because resolution of this issue concerned matter-of-law contract construction, *see Matagorda County Hospital District.*, 189 S.W.3d at 740, and the only other evidence (Burr's testimony) supports the trial court's finding, the error in assigning the burden of proof did not cause the rendition of an improper judgment or prevent Saba Zi from properly presenting the case on appeal. *See Romero*, 166 S.W.3d at 225.

## 2. $600,000 Capital Raise

The $600,000 "capital raise" was comprised of the repayment of a $300,000 loan or investment from six "investors" along with an equal amount of interest or return on the funds. The trial court stated in its findings that Burr provided unclear testimony whether the loan/investment or the repayment was made before or after the settlement agreement was executed.[19] As the trial court pointed out, if the expense was pre-settlement, it would be banned by the $4.5 million cap. The trial court further found that if the expense was post-settlement, it was not allowed under the settlement agreement, "particularly at usurious and extraordinarily unreasonable interest rates." The court concluded, "Borrowing money and paying

---

[18] *See supra* n.15. It also appears that $250,000 of the $500.000 in deducted management fees was placed into a reserve for the following year in September 2011; however, as explained in the text above, Burr testified that all post-closing work had ceased by September 2011.

[19] On Saba Zi's spreadsheet of expenses, the capital raise is listed as a post-settlement expense.

15

back outrageous returns appears to be more of a way to favor certain investors at Vaughn's expense, rather than conducting business under the Rule 11 Agreement limitations."

On appeal, Saba Zi's only complaint regarding the $600,000 is that there was no evidence to support the trial court's conclusion that the expense was not reasonable and necessary. It points to Burr's testimony that there was no other way to raise the funds because banks and other sources would not loan Saba Zi any money due to its financial condition at the time. While the trial court accepted Burr's testimony regarding the inability to obtain funding from other sources, the court did not agree that the expense was "reasonable and necessary in marketing and/or sale of the leases" as required by paragraph 2 of the settlement agreement before it could be deducted in calculating the amount due to Vaughn. Indeed, Burr testified that the $300,000 was spent to pay attorneys in the ongoing litigation.[20] Saba Zi offers no explanation as to how payment of these litigation expenses was reasonable and necessary for marketing or selling the leases. The plain language of the agreement, requiring expenses be "reasonable and necessary in marketing and/or sale of the leases," supports the trial court's refusal to permit Saba Zi to deduct the capital raise as an expense from Vaughn's respective share of the distribution. Moreover, because resolution of this issue involved matter-of-law contract construction, and the only other relevant evidence (Burr's testimony)

---

[20] When asked directly what the $300,000 was spent on, Burr responded, "We spent it on this litigation." At another point, he stated that the $300,000 "was all Saba Zi's litigation expense." He further discussed attorney's fees incurred for litigation of over $350,000. While at other points he mentioned marketing expenses and legal expenses associated with the sale of the leases, he did not specifically state that these expenses were paid from the capital raise.

Also of note, Saba Zi's spreadsheet of expenses shows the $600,000 capital raise as a post-settlement expense but also shows a separate expense for $152,000 in "Legal Fees," an additional $104,175 in "Legal/Professional" expenses, and $35,327 in "Marketing Expenses" post-settlement. These deductions were not challenged by Vaughn and are not specifically explained in Burr's testimony.

16

supports the trial court's finding, the error in assigning the burden of proof did not cause the rendition of an improper judgment or prevent Saba Zi from properly presenting the case on appeal.

### 3. Overriding Royalty Interest

As explained above, Saba Zi conveyed a 1% overriding royalty interest each to the Campbell Group and Bob Burr (Brian Burr's father) for services that it claimed it otherwise could not have paid for given its financial condition.[21] These conveyances implicate another section of the settlement agreement, paragraph 3, which provides: "Vaughn shall receive 41% of any Retained Royalty Interest retained or granted to TBG (as defined in Article VI of Saba Zi Exploration Limited Partnership Agreement) in the entire 31,273 acres, more or less, that Saba Zi owns." Saba Zi argues that paragraph 3's reference to Article VI enabled Saba Zi to convey the interests to these entities. Section 6.2 of Article VI states in relevant part as follows:

> [U]pon the sale . . . of any oil and gas or mineral leases . . . in which the Partnership retains a royalty interest in oil, gas or minerals produced from such real property (a "Retained Royalty Interests" [sic]), the General Partner shall cause the Partnership to distribute in kind and assign . . . up to 3.5% of the aggregate oil, gas and other minerals produced from the property . . . **to brokers, finders, and other such unrelated third persons** as the Partnership has entered into agreements to assign Retained Royalty Interests.[22]

---

[21] Regarding the Campbell Group, it is clear from Brian's testimony that it was originally to be paid cash for the services it rendered, but Brian, on behalf of Saba Zi, subsequently offered to give it a royalty interest in lieu of payment because Saba Zi was having difficulty paying the amount due. Regarding Bob, Brian testified that he brought his father in to assist with selling the leases after the company lost an expert it had been using for that purpose; Brian further indicated that Bob was promised an overriding royalty interest from the beginning because Saba Zi could not otherwise pay him for his services.

[22] Section 6.2 reads in full as follows:

Section 6.2. <u>Assignment and Distribution of Retained Royalty Interests</u>.

17

(Emphasis added.)

In its findings, the trial court pointed out that the conveyances were for services rendered and the parties agreed in paragraph 2 of the settlement agreement that historic expenses would be capped at $4.5 million and post-settlement expenses would be allowed only for reasonable and necessary expenses needed to market or sell the leases. The court further found that the promises to the Campbell Group and Bob Burr predated the settlement agreement.[23] The court then concluded that because historic expenses were capped, Saba Zi could not in effect pay for pre-settlement services with conveyance of an overriding royalty

---

Except as otherwise provided in Article XIII hereof, upon the sale or other disposition of any oil and gas or mineral leases or other interest in real property in which the Partnership retains a royalty interest in oil, gas or minerals produced from such real property (a "Retained Royalty Interests" [sic]), the General Partner shall cause the Partnership to distribute in kind and assign to the Partners interests in such Retained Royalty Interests, as follows:

(a)     As to any Retained Royalty Interest in the amount of 12.5% or less (the "Basic Retained Royalty Interest"):

(i)     First, to the Investor Limited Partner, a royalty interest in the amount of 2.0% of the aggregate oil, gas and other minerals produced from the property on the same terms and conditions as the Retained Royalty Interest;

(ii)     Next, up to 3.5% of the aggregate oil, gas and other minerals produced from the property on the same terms and conditions as the Retained Royalty Interests, to brokers, finders, and other such unrelated third persons as the Partnership has entered into agreements to assign Retained Royalty Interests;

(iii)     The balance of such Basic Retained Royalty Interest, if any, to the Founder Limited Partner [TBG].

(b)     As to any Retained Royalty Interest in excess of the Basic Retained Royalty Interest (the "Excess Retained Royalty Interest"), 50% of such Excess Retained Royalty Interest to the Founder Limited Partner and 50% of such Excess Retained Royalty Interest to the Investor Limited Partner.

[23] "[T]he testimony offered leads the Court to believe that the promises predated the Rule 11 Agreement." Burr's testimony was inconsistent on this matter, and it was for the trial court as factfinder to resolve those inconsistencies. *See Kormanik*, 362 S.W.3d at 687.

18

interest.  We do not agree with this interpretation.

As set forth above, paragraph 3 of the settlement agreement gave Vaughn 41% of any Retained Royalty Interest that TBG was entitled to receive, as defined in Article VI.  Unlike paragraph 2, dealing with Distributable Cash, paragraph 3 does not contain any additional limitations or requirements.  Under Article VI, Saba Zi was authorized to convey a royalty interest up to 3.5% to "brokers, finders, and other such unrelated third persons as the Partnership has entered into agreements to assign Retained Royalty Interests" before calculation of the interest to be assigned to TBG (and, under the settlement agreement, to Vaughn).  The trial court appears to have accepted that such agreements were made—to convey 1% each to the Campbell Group and Bob Burr—but determined that the $4.5 million cap on historic expenses barred the conveyances.  The court expressed particular concern that

> [w]ith historic expenses capped, Vaughn would have no reason to believe that overriding royalty interests would be conveyed, or had been promised.  The expansive interpretation of the partnership agreement offered by Saba Zi which would allow it to move 2% overriding royalty interest out of the Vaughn equation for any reason is too expansive.

The court's concerns, however, are not a proper basis for ignoring the plain language of the parties' agreement.  Even if the question of whether Vaughn had a reason to believe overriding interests had been promised were relevant to the analysis, Article VI (as incorporated into paragraph 3 of the settlement agreement) specified that up to a 3.5% interest could be conveyed before calculation of Vaughn's share.[24]  Additionally, since the trial court found that the promises occurred prior to execution of the settlement agreement, it is not the case that Saba

---

[24] Vaughn did not plead or prove any type of fraud occurred in relation to the promised conveyances or the negotiation of the settlement agreement between him and Saba Zi.

19

Zi moved expenses from the historically capped pre-settlement expenses column to the overriding royalty interest column, as the court feared. Since the promises occurred prior to execution, they had no impact on the historic cap imposed as of the date of execution; at that point, the Campbell Group was entitled to a royalty interest, not payment.[25] Nothing in the settlement agreement or Article VI (as incorporated into the settlement agreement) expressly restricts Saba Zi from converting a promise to pay cash for services into an "agreement[] to assign Retained Royalty Interests."

The trial court additionally found that the conveyance to Bob Burr was barred by Article VI's limitation that royalty interests could only be assigned to "unrelated third persons." The question then becomes whether Bob was a related third person under the terms of the Limited Partnership Agreement.[26] On this point, Vaughn argues, and the trial court apparently found, that Bob was excluded from receiving a royalty interest because of his father-son relationship with Brian.

---

[25] As Vaughn points out, Brian testified at one point that he attempted to negotiate the historic cap higher for the express purpose of paying Saba Zi's debt to the Campbell Group. But it is unclear whether the cap was actually increased for this purpose, and regardless, the trial court found that the conveyance was promised to Saba Zi prior to execution of the settlement agreement.

[26] The Limited Partnership Agreement does not define the phrase "unrelated third persons." While it does define "Person," the Definitions section of the agreement states that the definitions apply for "certain terms *capitalized* and used throughout this agreement." (Emphasis added.) The term "persons" is not capitalized in Article VI, so it is not entirely clear that the provided definition applies to that usage.

"Person" is defined in the agreement as "Any individual, company, partner, [sic] (whether general or limited), limited liability company, corporation, trust, estate, association, nominee or other entity." Even though this precise definition may not apply in Article VI, it is some indication the drafters would not have limited their definition to living persons as opposed to business entities as persons. *See generally Rosen v. Matthews Const. Co.*, 777 S.W.2d 434, 435-36 (Tex. App.—Houston [14th Dist.] 1989) (noting generally that corporations qualify under the law as persons for some purposes but not for others), *rev'd on other grounds*, 796 S.W.2d 692 (Tex. 1990).

But Brian is not a party to the Limited Partnership Agreement.[27] There is no indication in the Limited Partnership Agreement that the phrase "unrelated third persons" was intended to restrict someone who was not related to the partnership itself or one of the partners, as opposed to a mere representative of the partnership. In the absence of any such indication, we interpret the phrase as only prohibiting royalty interest conveyances to "persons" related to the partnership or one of the partners. There is no argument, suggestion, or evidence that Bob had any interest in or relationship with Saba Zi, or any of the entities that were partners in Saba Zi, other than providing services in exchange for a royalty interest.[28] The trial court erred in holding that the conveyances to the Campbell Group and Bob Burr were disallowed.[29] Consequently, we modify the trial court's judgment to change the amount of the overriding royalty interest assigned to Vaughn from 1.64% to .82 %.

## IV.    Conclusion

We overrule Saba Zi's first and third issues to the degree Saba Zi complains about the disallowance of deductions for $150,000 in management fees and the $600,000 capital raise; however, we sustain these issues to the extent that Saba Zi complains regarding disallowance of the 1% conveyance each to the Campbell Group and Bob Burr. Because we cannot discern any harm resulting from the trial court's error in assigning Saba Zi the burden of proof in this case, we overrule

---

[27] As explained above, *see supra* n.7, the trial transcript does not contain a detailed description of Brian's role for Sabi Zi, but he identified himself in an affidavit filed below as the "managing member" of Saba Zi's general partner and he is listed in the Limited Partnership Agreement as the president of each of Saba Zi's other partners. Regardless, although he signed the agreement as president of Saba Zi, as president of TBG, and as president of DCB, Brian is not a party to the Limited Partnership Agreement or otherwise identified therein as someone to whom third-persons could not be related in order to receive a royalty interest under Article VI.

[28] Brian testified that Bob's services were instrumental in getting the leases sold.

[29] Because we are reversing on this issue in Saba Zi's favor, we need not consider whether the error in assigning the burden of proof to Saba Zi on this issue caused any harm.

21

Saba Zi's second issue.

We modify the trial court's judgment to change the amount of the overriding royalty interest assigned to Vaughn from 1.64% to .82 %, and as so modified, the judgment is affirmed.

/s/         Martha Hill Jamison
                 Justice

Panel consists of Chief Justice Frost and Justices Jamison and Wise.