

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-24-00018-CV
_____

MICHAEL MARK MARTIN, RICHARD SCOTT MARTIN,
JEFFREY WEBB MARTIN, INDIVIDUALLY AND ON BEHALF OF NETWORK
OPERATOR SERVICES, INC., A TEXAS CORPORATION, Appellants

V.

RON HUTCHISON, TONY CASON, TIM MARTIN AND RONNIE MARTIN, Appellees

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 2019-601-B

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

MEMORANDUM OPINION

Appellants, minority shareholders in Network Operator Services, Inc. (NOS), brought a shareholder-derivative suit against Appellees, corporate directors, for breach of fiduciary duty, among other claims. The trial court dismissed certain claims Appellants brought in their individual capacities at the summary judgment stage, and the corporation's breach of fiduciary duty claim proceeded to jury trial. After the jury rendered a take-nothing verdict against the corporation, Appellants appealed both the judgment and partial summary judgment granted against them. We affirm.

## I. Background

The dispute among the parties here centers on the Appellees' transfer of a corporate asset to themselves. Appellants contend Appellees breached their fiduciary duty to NOS by transferring that corporate asset—ownership interest in a second corporation—to themselves, without approval from or notice to the corporation. Appellees contend that the majority directors of NOS agreed in 1998 to equalize ownership in future-formed companies amongst themselves and that this transfer was in line with that agreement.

In 1987, brothers Tim Martin and Ronnie Martin,[1] two of the Appellees, secured startup capital from two of their uncles, Richard Martin and Tony Rothrock, Jr., for a telephone operator business. Appellants, Mark Martin, Scott Martin, and Jeffrey Martin (who are Richard's sons and first cousins of Tim and Ronnie); Tim, Ronnie, Richard, Rothrock, and three other family

---

[1]Because numerous parties are surnamed Martin, we refer to each of the Martins by their given names.

2

members signed a preformation agreement to form NOS, and the close corporation began operations in January 1989.

As concerns the parties, the initial ownership of NOS was, according to the preformation agreement, as follows: Rothrock—37.00%; Richard—27.40%; Tim and Ronnie—12.50% each; and Appellants—1.70% each. The preformation agreement named Tim, Ronnie, Richard, and Rothrock as corporate directors and gave them the right to remain directors as long as they remained shareholders. The preformation agreement also gave Appellants' proxy votes on all shareholder actions to their father, Richard.

In October 1990, Ron Hutchison, Tim and Ronnie's brother-in-law and the third Appellee, joined NOS as chairman of the board. The NOS shareholders agreed to transfer a 7.5% interest to Hutchison from the interests of Tim, Ronnie, Richard, and Rothrock; thus, Hutchison became the fifth-largest NOS shareholder. NOS repaid Richard's and Rothrock's investments in full by 1991.

Ronnie and two non-family members formed Network Enhanced Telecom, L.L.P., (NetIP) to sell prepaid calling cards in the late 1990s. Each of the three owned 33.33% interest in the company.

At a NOS board meeting in 1998, while discussing NetIP, Appellees told Richard and Rothrock that they had enough new investors that they were not going to be junior partners anymore. Hutchison testified that, by that point, they "didn't need them." Hutchison said the ongoing business "had the reputation at the bank," and Appellees "were experts . . . in [their] field," so Appellees no longer needed their initial investors. Tim testified that Richard and

3

Rothrock "got between eight and nine times their money back in the first eight or nine years of operation."

Ronnie testified that, at the 1998 NOS board meeting, he said, "Today is the day, or we're going to go on without you." Tim and Ronnie testified that, after Richard and Rothrock had their own discussion, Appellees, Richard, and Rothrock came to a decision that day that they would all have an equal ownership in new companies going forward.

The minutes of the 1998 NOS board meeting state: "The Board members then discussed a proposal to spin-off the ownership of [NetIP] to stockholders. There was considerable discussion on this matter. Following such discussion there was a consensus to divide the ownership of the company as indicated on the attached sheet." The attached sheet indicates Ronnie's 33.33% interest in NetIP was divided by allocating a 4.794% interest to each of the five majority shareholders of NOS, with the remainder of the 33.33% allocated to the remaining NOS shareholders according to their respective percentages in NOS. The minutes did not mention any future equalization of interest between the five majority shareholders in any companies other than NetIP.

Around that same time, the parties formed Network Holding, LLP, as a holding company for the purpose of holding the 33.33% interest in NetIP that was transferred from Hutchison into NOS. Network Holding's interest was later increased to just under fifty percent.

In 2000, Appellees, along with a non-family member who was to be president of the corporation, formed Encompass Communications, L.L.C. (Encompass). Encompass was to sell prepaid calling cards to retail customers, and NetIP would provide the long-distance services

4

purchased. The majority ownership of Encompass was equalized among the five NOS majority shareholders and Encompass's president. Hutchison testified that Appellees were not required to give interests in Encompass to the NOS shareholders, because it was a new business—not NOS moving forward—but they did so anyway.

In 2002, Tim and Ronnie formed Tim Ron Enterprises, LLC (TimRon). Tim and Ronnie were its only owners. Later, a loan from NOS partially funded TimRon's expense in laying fiberoptic cable in Marshall and Shreveport.

Effective January 1, 2004, Tim and Ronnie transferred TimRon to NOS for tax purposes, they said, as TimRon's losses would offset NOS's income from NOS's profitable companies. Hutchison testified there was no reason to equalize the ownership of TimRon when it was transferred because it was serving a purpose of offsetting tax liability. Hutchison said he knew the ownership of TimRon would eventually be equalized if the company was successful. Ronnie admitted that, by placing TimRon under NOS ownership, TimRon became an asset owned by NOS.

On July 1, 2005, NOS transferred a 30% interest in TimRon to Tony Cason, whom Tim and Ronnie wanted to run TimRon in order to move into fiberoptics. Cason presented the fiberoptics plan to a board meeting of NOS in 2005, where Richard and Rothrock were present. Cason testified that Ronnie said at that meeting that they would all be equal partners, except for Cason, who would have a 30% interest. Cason testified that the remainder of the board directed Hutchison, as chairman of the board, "to do whatever he needed to do and to make certain that

5

[Cason] got [his] 30[%]" interest. The transfer to Cason resulted in NOS's ownership of 70% of TimRon.

In 2007, Cason transferred ownership of his 30% interest in TimRon back to NOS, meaning NOS once again had a 100% ownership interest in TimRon. Cason testified that he did not have any profitable business against which he could offset the TimRon losses. Since some of the NOS companies were doing very well, Cason said the NOS group could use the TimRon losses to offset some of those gains for tax purposes. Hutchison said that transfer was an oral agreement that included the stipulation that NOS would "at any point in time" transfer the interest back to Cason.

Rothrock declared bankruptcy in 2010, and his shares were returned to NOS and its affiliates. Cason became concerned that Rothrock's bankruptcy might impact his interest in TimRon, and Appellees agreed to transfer the 30% interest in TimRon back to Cason.

Appellees later moved much of their business into Centris, a wholly owned subsidiary of NOS. They moved NOS's call centers and operators into Centris and began handling customer-service calls. In 2012, NOS sold off its operator business and ceased to conduct business of its own, becoming a holding company for the other businesses. As a result, in 2012, NOS operated through NetIP, Encompass, Centris, and TimRon. Centris, a wholly owned subsidiary of NOS, was not equalized among the majority shareholders of NOS.

After Rothrock's bankruptcy, and by the end of 2012, the remaining four NOS majority shareholders—Appellees and Richard—had equalized their ownership in NetIP (resulting in equalized ownership in Network Holding) and Encompass. At that time, each of these four men

owned the following interest in each of these:[2] in Network Holding, 16.382%; in NetIP, 7.829%; and in Encompass, 13.86%.

Richard died on May 14, 2013, the year that TimRon began turning a profit. In late 2014, Suddenlink offered to buy TimRon for $32 million, but the sale never came to pass due to some environmental restrictions Suddenlink imposed that were unacceptable to TimRon.

After the Suddenlink deal fell through, effective January 1, 2015, Tim and Ronnie signed a NOS board resolution, adopted by the NOS directors without notice to the other NOS shareholders, which stated that "it ha[d] been the agreement of <u>controlling shareholders</u> to have equal ownership of all companies created subsequent to [NOS]." The resolution provided that NOS would transfer 30% of its interests in TimRon to Appellees, who received 10% each. NOS transferred those interests via written assignment, but there was no written shareholders' agreement authorizing the transfer. That same effective date, the executor of Richard's estate transferred Richard's shares in NOS to Appellants.

When initially questioned about the decrease in NOS's interest in TimRon, Hutchison told one shareholder that the transfers to Appellees were to incentivize performance. At trial, Appellees testified that the transfers were made based on the oral agreement between the principal shareholders in 1998 to equalize interests in new companies formed after NOS. Hutchison testified that reducing NOS's record ownership in TimRon from 70% to 40% by

---

[2]Richard's interests represent the total of his personal and trust interests.

transferring 10% to each Appellee roughly equalized the interests of the three men in TimRon with Richard's interest.[3]

In 2018, Conterra offered to acquire TimRon for $48 million. The parties signed an agreement to transfer TimRon to Conterra in June 2018, and the sale closed in August. An NOS shareholder's meeting was held shortly after the sale. The shareholders were informed of the sale but not of the transfer of the NOS stock. After certain of TimRon's financial obligations were paid off, almost $32 million was distributed as follows, according to the percentage interests of each owner: 40% to NOS, 30% to Cason, and 10% to each Appellee.[4]

Hutchison sent a letter to the NOS shareholders on September 7, 2018, informing them of the sale of TimRon and enclosing each shareholder's share of the proceeds from the sale. In mid-October 2018, Penny Young, Mark's accountant, inquired of Hutchison about the transfers. Hutchison responded that NOS owned 40% of TimRon, and Mark testified that was the first time he became aware of the transfer of ownership interests in TimRon.[5] Young responded by asking about NOS's decrease in ownership from 70% to 40%, and Hutchison explained:

> [NOS's] ownership position of [TimRon] . . . changed effective January 1, 2015. The agreement of the founding shareholders was to have equal ownership of all companies and opportunities created subsequent to NOS. This agreement is reflected in the ownership percentages of both Encompass and Network Holdings.

---

[3]Richard owned 37.68% of NOS, and after the transfer, he indirectly owned 15.072% (as 37.68% of NOS's 40% share in TimRon). Tim and Ronnie each owned 15.96% of NOS, and after the transfer, they each indirectly owned 6.384% of TimRon (as 15.96% of NOS's 40%), which, combined with their 10% direct ownership, resulted in a 16.384% interest in TimRon. Hutchison owned 7.75% of NOS, and after the transfer, he indirectly owned 3.1% of TimRon (as 7.75% of NOS's 40%), plus his 10% direct interest, for a total of 13.100%.

[4]Conterra stock included in the purchase price was later sold, and an escrowed contingent fee was released. Proceeds from each were also distributed to the owners of TimRon according to their percentage interests.

[5]Scott also testified he was surprised to learn of the dilution of the NOS share of TimRon from 70% to 40% after TimRon was sold, as did Jeffrey.

8

NOS was able to fully utilize the net operating losses generated by [TimRon] during its prolonged startup phase. The change in ownership reflects the founding shareholders intentions and agreement.

Appellants filed a shareholder's derivative action on behalf of NOS, seeking to have Appellees repay almost $12.8 million they received from NOS.[6] When the matter reached trial, Appellants' live pleading was the fifth amended petition. Relevant to this appeal, the petition asserted these claims:

1.    Appellees committed civil theft, conversion, and fraud in misappropriating funds and stock that belonged to NOS, in violation of the Civil Theft Act, TEX. CIV. PRAC. & REM. CODE ANN. § 134.001, *et. seq.*;

2.    Appellees breached their fiduciary duties to NOS by misappropriating money;

3.    Appellees breached their fiduciary duties to Appellants—established "by virtue of their positions of leadership and responsibility in NOS," close familial ties, law, the preformation agreement, and the NOS by-laws—by diluting Appellants' interest in TimRon, "failing to authorize the payment of dividends from NOS" to Appellants, "misappropriating corporate assets," and retaining profits of NOS "for their own use and benefit";

4.    An equitable claim on behalf of NOS for money had and received; and

5.    Appellees breached the NOS preformation agreement by failing to pay dividends to Appellants.

Appellants moved for partial traditional summary judgment on the issue of the transfer of the NOS shares to Appellees, claiming there was no agreement authorizing the dilution of NOS's ownership in the TimRon stock. The trial court denied Appellants' motion. Appellees then

---

[6]Appellees soon moved to dismiss under the Texas Citizens' Participation Act (TCPA). *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011, §§ 27.005, 27.010 (Supp.). The trial court granted the dismissal, and Appellants appealed. We concluded that the TCPA did not apply to Appellants' claims and that the trial court erred in dismissing them. *Martin v. Hutchison*, No. 06-19-00093-CV, 2020 WL 6788243, at *15 (Tex. App.—Texarkana Nov. 19, 2020, pet. denied) (mem. op.). We reversed the trial court's judgment and remanded the case to the trial court for further proceedings. *Id.*

9

moved for no-evidence and traditional summary judgment on all Appellants' claims. The trial court denied Appellees' motion as to the derivative claim of breach of fiduciary duty but granted summary judgment as to all Appellants' remaining claims without specifying the grounds.

As the matter neared trial, Appellants filed a motion to exclude evidence of any oral agreement between Appellees, Rothrock, and Dr. Martin "to 'equalize' ownership in the companies related to NOS." Appellants argued that, "[b]ecause an oral shareholders' agreement is unenforceable as a matter of law, and because the Rules of Evidence do not allow for testimony as to statements made by a deceased person, the [trial court] should disallow any evidence or testimony urging [that] an oral agreement validated [Appellees'] transfer" of NOS's 30% interest in TimRon to themselves. Prior to the start of trial, the court denied Appellants' motion during the pretrial conference, stating that the oral contract was "still a defense" and that it would "allow evidence [of the oral agreement] and let the jury make the decision."

The matter proceeded to jury trial on the derivative action for breach of fiduciary duty. After the trial, in three separate questions, the jury was asked whether each Appellee failed to comply with his fiduciary duty to NOS. In each case, the jury answered, "No." Based on the jury's verdict, the trial court entered a take-nothing judgment against Appellants. Appellants filed a motion to disregard the jury's findings or, in the alternative, motion for new trial, which was denied by operation of law. This appeal followed.

## II.     Issues on appeal

In four issues, Appellants urge that the trial court erred (1) "in denying [their] Motion to Disregard the Jury Verdict," (2) "in refusing to charge the jury that [Appellees] had [the] burden

of proof that they did not breach their fiduciary duty," (3) "in refusing to charge the jury that they could not consider any oral" shareholders' agreement, and (4) in granting partial summary judgment against them. In our analysis, we reorder Appellants' issues because we find it necessary to resolve their second and third issues in order to resolve the first one. *See* TEX. R. APP. P. 38.1(f).

## III. Did the Trial Court Err in Submitting the Jury Charge?

Appellants, in their second issue, raise error in failing to charge the jury that Appellees had the burden of proving that they did not breach their fiduciary duty. In their third issue, Appellants allege error in failing to instruct the jury "they could not consider any oral agreement between [Appellants] and other shareholders."

### A. Preservation of Error

With respect to Appellants' second issue, Appellees claim Appellants did not preserve this issue for appeal because they did not tender "in writing" "'substantially correct' [questions] or instructions on the burden of proof."

In order to preserve error for review on appeal, the record must show that (1) the complaining party made "a timely request, objection, or motion" to the trial court, in compliance with the applicable procedural rules, "stat[ing] the grounds for the ruling" the party sought; and (2) "the trial court . . . ruled on the request, objection, or motion," or "refused to rule[,] . . . and the complaining party objected to th[at] refusal." TEX. R. APP. P. 33.1(a); *Est. of Martin*, No. 06-22-00061-CV, 2023 WL 3185811, at *6 (Tex. App.—Texarkana May 2, 2023, no pet.) (mem. op.). Specifically with respect to claiming error in the jury charge, a trial court's failure to

11

submit a requested question or instruction is not a ground for reversal "unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment."  TEX. R. CIV. P. 278; *see R.R. Comm'n of Tex. v. Gulf Energy Expl. Corp.*, 482 S.W.3d 559, 571 (Tex. 2016) (citing Rule 278 regarding requested questions); *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007) (citing Rule 278 regarding requested instructions).

Appellees claim that the record does not contain Appellants' requested questions or indicate that they were tendered to the court.[7]  However, after Appellees filed their brief, the appellate record was supplemented with Appellants' proposed jury charge.  The supplemental record indicates Appellants' proposed charge was filed on the last day of testimony—the same day as the jury charge conference.

At the jury charge conference, the trial court indicated it had held the charge conference outside the presence of the jury, at which time the trial court submitted its proposed instructions to each side.  On the record, then, the trial court asked whether each side had had an opportunity to review the court's proposed jury instructions.  At that time, both parties made their objections to the court's proposed charge on the record.  Specifically, Appellants' counsel stated he "submitted" certain proposed instructions and "ha[d] requested" that the burden of proof on breach of fiduciary duty be placed on Appellees.  Appellants' counsel quoted the instructions requested in Appellants' proposed jury charge.  Appellants then referenced the proposed

---

[7]Appellees do not claim that Appellants failed to submit instructions regarding the oral agreement.  Rather, they assert Appellants waived any error regarding this issue by failing to object to the testimony regarding the oral agreement, as discussed above.

12

questions regarding breach of fiduciary duty, objected to the instruction as proffered by the trial court, and requested that the burden be placed on Appellees to prove that they complied with their fiduciary duties. The trial court overruled Appellants' objections.

Considering Appellants' objections at the charge conference, along with their proposed charge filed on the day of the charge conference, it appears Appellants had submitted their proposed jury charge in writing prior to the charge conference. Accordingly, we determine Appellants' efforts were "sufficient to preserve error with respect to the court's refusal to submit [their] requested [questions and] instructions." *City of Lufkin v. AKJ Props., Inc.*, No. 06-1200005-CV, 2012 WL 2393087, at *6 (Tex. App.—Texarkana June 26, 2012, no pet.) (mem. op.). Having determined that Appellants preserved their jury charge issues, we must consider whether their requested questions and instructions were substantially correct. *See* TEX. R. CIV. P. 278.

## B. Standard of Review

"We review jury charge error under an abuse-of-discretion standard." *Knoderer v. State Farm Lloyds*, 515 S.W.3d 21, 41 (Tex. App.—Texarkana 2017, pets. denied) (citing *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam)). "Yet even if a trial court errs in submitting a jury question or instruction, we cannot reverse a judgment for charge error unless that error was harmful." *In re Est. of Poe*, 648 S.W.3d 277, 285 (Tex. 2022); TEX. R. APP. P. 61.1(a) ("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the Supreme Court concludes that the error complained of . . . probably caused the rendition of an improper judgment . . . ."). "A judgment will not be reversed for

13

charge error unless the error was harmful because it probably caused the rendition of an improper verdict or probably prevented the petitioner from properly presenting the case to the appellate courts." *Knoderer*, 515 S.W.3d at 41 (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009)).

"Charge error is generally considered harmful if it relates to a contested, critical issue." *In re Est. of Poe*, 648 S.W.3d at 285 (quoting *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012)). "An improper instruction is especially likely to cause an improper judgment when 'the trial  is contested and the evidence sharply conflicting.'" *Id.* (quoting *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001)). "In determining whether error in the charge requires reversal, we analyze the entire record." *Id.* at 285–86.

We first address the burden of proof on breach of fiduciary duty.

## C.     Burden of Proof on Breach of Fiduciary Duty

At the charge conference, Appellants objected to the submission of the court's proposed questions on breach of fiduciary duty and proposed instead jury questions that placed the burden of proving compliance with their fiduciary duties on each Appellee, tracking pattern jury charge 104.2.[8]  *See* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY

---

[8]Appellants' proposed questions read as follows, with one question for each Appellee:

Did [Appellee] comply with *his* fiduciary duty to [NOS]?

*Because a relationship of trust and confidence existed between them*, as an officer or director of [NOS], [Appellee] owed [NOS] a fiduciary duty.  To prove *he* complied with *his* duty, [Appellee] must show—

　　　　1.　　　　the transaction in question *was* fair and equitable to [NOS]; and

　　　　2.　　　　[Appellee] made reasonable use of the confidence that [NOS] placed in *him*; and

14

CHARGES: *Question and Instruction—Breach of Fiduciary Duty, Defined by Common Law—Burden of Fiduciary*, PJC 104.2 (2018). The trial court overruled Appellants' objection and instead submitted questions placing the burden of proving a breach of fiduciary duty on Appellants.[9]

---

3. [Appellee] acted in the utmost good faith and exercised the most scrupulous honesty toward [NOS]; and

4. [Appellee] placed the interests of [NOS] before *his* own and did not use the advantage of *his* position to gain any benefit for *himself* at the expense of [NOS]; and

5. [Appellee] fully and fairly disclosed all important information to [NOS] concerning the transactions.

Answer "Yes" or "No."

Answer: _____

[9]The trial court submitted the following breach of fiduciary question with respect to each Appellee, placing the burden of proving a breach of fiduciary duty on Appellants and including two instructions to which Appellants objected but did not raise as error on appeal:

Did [Appellee] fail to comply with *his* fiduciary duty to [NOS]?

As a corporate officer or director of [NOS], [Appellee] owed [NOS] a fiduciary duty. To prove [Appellee] failed to comply with *his* fiduciary duty, [NOS] must show—

1. the transaction in question was not fair and equitable to [NOS]; or

2. [Appellee] did not make reasonable use of the confidence that [NOS] placed in *him*; or

3. [Appellee] failed to act in the utmost good faith or exercise the most scrupulous honesty toward [NOS]; or

4. [Appellee] placed *his* own interests before [NOS]'s, used the advantage of *his* position to gain a benefit for *himself* at the expense of [NOS], or placed *himself* in a position where *his* self-interest might conflict with *his* obligations as a fiduciary; or

5. [Appellee] failed to fully and fairly disclose all important information to NOS concerning the transaction.

15

"Directors owe a fiduciary duty to their corporations in the actions they take as directors." *In re Est. of Poe*, 648 S.W.3d at 87 (citing *Ritchie v. Rupe*, 443 S.W.3d 856, 868 (Tex. 2014)). Under common law, when a fiduciary "benefit[ted] from a transaction with [its] principal[, the fiduciary had] the obligation to establish the fairness of the transaction." *Id.* at 289 (citing *Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 508–09 (Tex. 1980): "[A] fiduciary . . . is under the fiducial obligation of establishing the fairness of the transaction to his principal."). Further, though the Texas Legislature has determined that, under certain conditions, "transactions between a corporation and an interested director should be given full legal effect," *id.*, a director also bears the burden of proving that a self-dealing transaction meets these conditions, *id.* at 290.

It is undisputed that Appellees, as directors of NOS, owed a fiduciary duty to the corporation with respect to the transaction in question, the transfer of a corporate asset, TimRon shares, to themselves. Appellees thus bore the burden of demonstrating the fairness of the transaction. *See id.* at 289.

Appellees contend certain cases indicate a plaintiff must allege self-dealing in their petition to trigger the presumption of unfairness of a fiduciary's self-dealing transaction and shift

---

You are instructed that a director or officer of a corporation is permitted to profit personally from an interested transaction, but his profit must be incidental to the promotion of corporate interests.

You are further instructed that a director or officer of a corporation shall not be liable for claims against him if, in the discharge of his duties, he exercised ordinary care and acted in good faith and honestly exercised his best business judgment and discretion.

Answer "Yes" or "No."

Answer: _____

the burden of proof to the fiduciary, and they assert Appellants did not allege self-dealing. We disagree on both counts.

First, *In re Estate of Poe* indicates that a corporate fiduciary bears the burden of proving the fairness of a self-dealing transaction. *Id.* at 290. Second, Appellants' live pleading was sufficient to give Appellees fair notice that they were making a claim for self-dealing.

"Texas follows a 'fair notice' standard for pleading, in which courts assess the sufficiency of pleadings by determining whether an opposing party can ascertain from the pleading the nature, basic issues, and the type of evidence that might be relevant to the controversy." *Low v. Henry*, 221 S.W.3d 609, 612 (Tex. 2007). "Self-dealing can be generally defined as an occurrence in which the fiduciary uses the advantage of his position to gain a benefit at the expense of those to whom he owes a fiduciary duty." *Mims-Brown v. Brown*, 428 S.W.3d 366, 374 (Tex. App.—Dallas 2014, no pet.).

Appellants' live petition alleged that Appellees were directors and/or officers of NOS and owed NOS a fiduciary duty; NOS was under the control of Appellees; the 70% stake in TimRon owned by NOS was diluted to 40% "without the knowledge, consent or ratification of [Appellants]"; the dilution occurred by distributing 10% out of NOS's 70% stake in TimRon to each of the three Appellees; and NOS received a 40% distribution of net cash from the sale of TimRon rather than the 70% to which it was entitled, with each of the three Appellants receiving 10% of the cash. Further, the parties discussed the issue of self-dealing at the pretrial conference. Appellees asked for clarification on whether Appellants were moving forward to trial with the allegation that the actions Appellees took were self-dealing, and Appellants

17

responded that they were. At the pretrial conference, Appellees neither objected to Appellants' moving forward on their claim of self-dealing nor sought a continuance for additional time to respond to that claim. This record indicates Appellees were, in fact, on notice that Appellants had pled a claim of self-dealing. Appellees' claim regarding a shifting burden of proof fails on this point.

Next, Appellees argue that they rebutted the presumption of unfairness through "the uncontroverted evidence of the oral agreement to equalize interests" such that the burden of proof never shifted from Appellants to Appellees, citing this Court's opinion in *In re Estate of Grogan*, 595 S.W.3d 807, 818 (Tex. App.—Texarkana 2020, no pet.). However, again, we find *In re Estate of Poe* controlling, and it placed the burden of proof on the interested director. *See In re Est. of Poe*, 648 S.W.3d at 290.

Under these circumstances, the burden of proving fairness in the self-dealing transaction was on Appellees. Accordingly, the trial court erred in submitting questions 1 through 3, placing the burden of proving a breach of fiduciary duty on Appellants.

### D.     Requested Instructions

Appellants assert in their third issue that the trial court erred in failing to instruct the jury that "they could not consider any oral agreement between [Appellants] and other shareholders." Appellants requested two instructions based on statutes and one on an evidence rule, as follows:

> 12.     You are instructed that an agreement among and between shareholders is enforceable only if it in [sic] writing and signed by all the shareholders.

> 13.     You are further instructed that an oral agreement is not enforceable if it cannot be performed within one year of it being made.

18

14.    You are further instructed that you may not consider as evidence any oral statements made by a deceased person.

Appellants argue the first requested instruction was required by Section 21.101 of the Texas Business Organizations Code.  Appellants claim this instruction was necessary because none of Appellants were notified of nor participated in the oral agreement allegedly struck in 1997 or 1998.

Section 21.101 of the Texas Business Organizations Code provides, "The shareholders of a corporation may enter into an agreement that . . . establishes the terms of an agreement for the transfer or use of property . . . between the corporation and another person, including a shareholder, director, officer, or employee of the corporation."  TEX. BUS. ORGS. CODE ANN. § 21.101(a)(8).  Such an agreement must be "a written agreement that is . . . signed by all of the shareholders at the time of the agreement; and . . . made known to the corporation; and . . . amended only by all of the shareholders at the time of the amendment, unless the agreement provides otherwise."  TEX. BUS. ORGS. CODE ANN. § 21.101(b)(1)(B), (2).

Appellants' argument overlooks two critical facts.  First, the language of the statute does not require a shareholders' agreement—it is permissive rather than mandatory.  Second, Section 21.101 was added in 2003 with an effective date of January 1, 2006.  *See* Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 1, sec. 21.101, 2003 Tex. Gen. Laws 287, 414 (amended 2013) (current version at TEX. BUS. ORGS. CODE § 21.101).

Although Appellants advance the application of a 1989 federal case based on the previous Business Corporation Act provision then in effect, the historical statute at issue in that

19

case dealt solely with voting agreements, which is not the type of agreement at issue here. *See Sanders v. McMullen*, 868 F.2d 1465, 1467 (5th Cir. 1989) (citing then-in-effect TEX. BUS. CORP. ACT art. 2.30(B)[10]). Section 21.101 would not have applied to a non-voting agreement made in 1998.

Although Appellants present additional statutes (also with effective dates of 2006) that require that shareholder agreements be in writing, Appellants present no authority regarding why a decision by a board of directors in 1998 to equalize shares in future corporations would have needed to be approved by shareholders and thus would have required a shareholder agreement. Rather, Appellants' arguments that such a shareholder agreement must have been in writing presumes there was a need for a shareholder agreement in this instance. Yet, a cursory review of the statute regarding shareholders' agreements in place prior to the codification of the Business Organizations Code indicates that such agreements at that time were also permissive rather than mandatory.[11] Appellants have not directed us to any applicable authority requiring a shareholders' agreement in these circumstances. We conclude the trial court did not err in excluding the first requested instruction.

Appellants claim their second requested instruction was required by the statute of frauds found in Section 26.01 of the Texas Business and Commerce Code, mandating that an agreement "which is not to be performed within one year from the date of making the agreement" must be in writing. TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(6). Appellants

---

[10]Act of May 11, 1961, 57th Leg., R.S., ch. 206, § 2, 1961 Tex. Gen. Laws 423, 423 (repealed 1981).

[11]*See* Act of May 30, 1981, 67th Leg., R.S., ch. 818, § 1, 1981 Tex. Gen. Laws 3102, 3105 (expired January 1, 2010).

argue that the agreement's contemplated equalization of ownership in businesses "created or acquired at any time in the future" made the 1998 agreement invalid.

Appellants' argument here wrongly interprets the application of the statute of frauds. We have previously stated that "[a] contract that could possibly be performed within a year, however improbable performance within one year may be, does not fall within the statute of frauds." *Monasco v. Gilmer Boating & Fishing Club*, 339 S.W.3d 828, 838 (Tex. App.— Texarkana 2011, no pet.) (citing *Niday v. Niday*, 643 S.W.2d 919, 920 (Tex. 1982) (per curiam)). "The fact that the entire performance within one year is not required or expected will not bring an agreement within the statute." *Id.* (citing *Niday*, 643 S.W.2d at 920).

Appellees' 1998 oral agreement with the major NOS shareholders to equalize ownership in future companies could possibly have been performed within a year, had all future companies been formed within a year. The fact that the agreement did not require equalization to occur within a year did not bring the agreement within the statute of frauds. The trial court did not err in refusing to include Appellants' requested instruction incorporating Section 26.01.

Appellants' third requested instruction was based on "the Dead Man's Rule," Rule 601(b) of the Texas Rules of Evidence. *See* TEX. R. EVID. 601(b). Appellants claim that because Dr. Martin and Rothrock were deceased, testimony as to their acquiescence in an agreement to equalize ownership should have been excluded.

Again, Appellants misconstrue the law. As is relevant here, the Dead Man's Rule "prohibits a party in a suit by or against a decedent's heirs or representatives from testifying 'about an oral statement' made by the decedent unless . . . 'the party's testimony about the

21

statement is corroborated.'" *Bertucci v. Watkins*, No. 23-0329, 2025 WL 807355, at \*10 (Tex. Mar. 14, 2025) (quoting TEX. R. EVID. 601(b)(2), (3)). Assuming without deciding that the Dead Man's Rule is applicable here, sufficient evidence corroborated the 1998 agreement to make the exception found in Rule 601(b)(3) applicable.

Appellants themselves introduced Hutchison's 2018 letter in response to Young's inquiry about the transfer in ownership of NOS shares, which stated that the founding shareholders of NOS had an agreement "to have equal ownership of all companies and opportunities created subsequent to NOS. This agreement is reflected in the ownership percentages of both Encompass and [TimRon]." The directors' agreement to equalize interests in NetIP was evidenced in the minutes of the 1998 NOS directors' meeting. Hutchison and Tim testified about the equalization of Encompass in 2000 and Network Holdings. Cason, not a party, testified that Hutchison, as chairman of the NOS board, was directed to do what he needed to do at a 2005 board meeting to make the NOS partners have equal ownership in TimRon. "Corroborating evidence need not be sufficient standing alone, but [it] must tend to confirm and strengthen the testimony of the witness and show the probability of its truth." *Id.* (alteration in original) (quoting *Fraga v. Drake*, 276 S.W.3d 55, 61 (Tex. App.—El Paso 2008, no pet.)). We conclude that this corroborating evidence was sufficient to come under the exception to the Dead Man's Rule found in Rule 601(b)(3), and the trial court did not err in denying Appellants' third requested instruction.

We overrule Appellants' third issue.

22

Having concluded the trial court erred in placing the burden of proving breach of fiduciary duty on Appellants but did not err in refusing Appellants' requested instructions, we consider whether Appellants demonstrated harm as a result of the charge error.

### E.      Did Appellants Demonstrate Harm as a Result of the Charge Error?

"[T]he submission of an erroneous question can be harmful if it confuses or misleads the jury in answering a question that is properly submitted and material to the judgment." *In re Est. of Poe*, 648 S.W.3d at 291. Nonetheless, "we cannot reverse a judgment for charge error unless that error was harmful." *Id.* at 285; *see* TEX. R. APP. P. 44.1(a), 61.1(a); *see also Saba Zi Expl., L.P. v. Vaughn*, 448 S.W.3d 123, 130 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (applying Rule 44.1(a) when burden of proof was wrongly assigned at trial). "To determine whether a particular question or instruction confused or misled the jury, we 'consider its probable effect on the minds of the jury in the light of the charge as a whole.'" *In re Est. of Poe*, 648 S.W.3d at 286 (quoting *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995)).

Appellants provide no argument as to how they were harmed by the wrongly assigned burden of proof. And though the parties differ sharply on the propriety of Appellees' transfer of the NOS shares to themselves, the facts here are largely undisputed. It is undisputed that Appellees were directors of NOS and that they transferred ownership in 10% of TimRon from NOS to each of themselves in 2018 after TimRon was sold to Conterra for $48 million. Appellees contended those transfers were in furtherance of a 1998 agreement between the controlling directors of NOS to equalize ownership in corporations formed after NOS. Appellants argue Appellees had no valid shareholder agreement upon which to base the self-

23

dealing transfers of this corporate asset. As discussed above, Appellants have not demonstrated that an agreement among the shareholders was necessary when the agreement to equalize was made in 1998.

More importantly at this stage, Appellants have not demonstrated how the trial court's error in assigning the burden of proof on breach of fiduciary duty "probably caused the rendition of an improper judgment" or "probably prevented [them] from properly presenting the[ir] case to [this Court]." TEX. R. APP. P. 44.1(a). Although Appellants argue that the burden should have been on Appellees to show that the transaction was fair, Appellees *did* present evidence and argument as to why the transaction was fair—it aligned with the long-standing agreement of the major NOS shareholders, an agreement to equalize interests in future endeavors, made for the purpose of allowing NOS's continued involvement in those endeavors

Further, the record demonstrates that Appellants' own actions affected the trial court's perspective as to burden of proof. First, as discussed above, Appellants did not explicitly plead self-dealing on the part of Appellees. Nonetheless, "out of an abundance of caution," Appellees addressed self-dealing in their motion for summary judgment, and the debate about burden of proof began. Appellees stated in their motion that, "[i]f self-dealing were pled an alleged a [sic] presumption of unfairness automatically arises, which the fiduciary bears the burden to rebut." Appellants responded at that stage that Appellees' "taking of the [TimRon] stake . . . was not an act of 'self dealing' within the meaning of the statute or as the term is commonly used and understood." As the matter proceeded to trial on the breach of fiduciary duty issue, Appellants filed a motion to exclude evidence, stating therein that Appellees' act in transferring the NOS

24

shares to themselves was an act of self-dealing. At pretrial, Appellants stated that this was "a case of self-dealing."

Thus, as trial began, all parties and the trial court understood that Appellants were proceeding on their claim of self-dealing. Yet, though Appellants asked the trial court to place the burden of proof on Appellees, they never objected to their position in the normal course of a jury trial—that is, they opened, closed, and provided a final rebuttal without ever objecting to that order of proceedings.

Appellants do not present any argument about how placing the burden of proof on Appellees, rather than on themselves, caused an improper judgment or somehow impeded the presentation of their case on appeal. Accordingly, we determine the trial court's error in submitting the jury charge placing the burden of proving a lack of breach of fiduciary duty on Appellees is not reversible, as Appellants have not demonstrated harm.

We overrule Appellants' second issue.

## IV. The Motion to Disregard the Verdict

Appellants' first issue, challenging the trial court's denial of their motion to disregard the jury's verdict, charges that there was no evidence supporting the jury's findings that Appellees "did not violate their fiduciary duty to the corporation when they [transferred] 30% of the [TimRon] interest from NOS." Appellants moved for an order that, as a matter of law, Appellees breached their fiduciary duties to the corporation. Our record does not reflect any ruling on Appellants' motion; thus, we determine it was overruled by operation of law. *See* TEX. R. CIV. P. 329b.

25

## A.      Standard of Review and Applicable Law

We review a trial court's action on a motion to disregard the verdict "under a no-evidence standard, meaning we 'credit [all] evidence favoring the jury verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.'" *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009) (footnote omitted) (citation omitted) (quoting *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007)); *see Pleasant Grove Indep. Sch. Dist. v. FieldTurf USA Inc.*, 648 S.W.3d 608, 613 (Tex. App.—Texarkana 2022, pet. denied) (op. on remand). Such a review is the equivalent of a legal sufficiency challenge. *See Williard Law Firm, L.P. v. Sewell*, 464 S.W.3d 747, 751 (Tex. App.—Houston [14th Dist.] 2015, no pet.). "We will uphold the jury's finding if more than a scintilla of competent evidence supports it." *Tanner*, 289 S.W.3d at 830; *Pleasant Grove Indep. Sch. Dist.*, 648 S.W.3d at 613. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Tanner*, 289 S.W.3d at 830 (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)); *Pleasant Grove Indep. Sch. Dist.*, 648 S.W.3d at 613; *see 1812 Franklin St. v. State*, 614 S.W.3d 179, 183 (Tex. App.—Texarkana 2020, pet. denied).

As stated in *United Rentals N. Am., Inc. v. Evans*,

> The evidence is legally insufficient to support a jury finding when "(1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact."

26

*United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 640 (Tex. 2023) (quoting *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018)). "More than a scintilla of evidence exists when the evidence reaches a level enabling reasonable and fair-minded people to differ in their conclusions." *1812 Franklin St.*, 614 S.W.3d at 183 (quoting *Petrohawk Props., L.P. v. Jones*, 455 S.W.3d 753, 770 (Tex. App.—Texarkana 2015, pet. dism'd)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)).

"Under Texas law, the business and affairs of a corporation are managed through a board of directors." *In re Est. of Poe*, 648 S.W.3d at 286 (citing Tex. Bus. Orgs. Code Ann. § 21.401(a)). "Directors owe a fiduciary duty to their corporations in the actions they take as directors." *Id.* at 286–87 (citing *Ritchie*, 443 S.W.3d at 868). "A director's fiduciary status creates three broad duties: duties of obedience, loyalty, and due care." *Id.* at 287 (citing *Loy v. Harter*, 128 S.W.3d 397, 407 (Tex. App.—Texarkana 2004, pets. denied)). "These fiduciary duties run to the corporation, not to individual shareholders or even to a majority of shareholders." *Id.*

"[A] director's fiduciary duty includes a duty to dedicate 'uncorrupted business judgment for the sole benefit of the corporation.'" *Id.* (quoting *Ritchie*, 443 S.W.3d at 868). This "business judgment rule is 'a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company [and its shareholders].""" *Moody v. Nat'l W. Life*

27

*Ins. Co.*, 634 S.W.3d 256, 274 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (alteration in original) (quoting *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001)).

> The business judgment rule generally protects corporate officers and directors, who owe fiduciary duties to the corporation, from liability for alleged breach of duties based on actions that are negligent, unwise, or imprudent if the actions were "within the exercise of their discretion and judgment in the development or prosecution of the enterprise in which their interests are involved."

*Lowry v. Tarbox*, 537 S.W.3d 599, 615–16 (Tex. App.—San Antonio 2017, pet. denied) (quoting *Sneed v. Webre*, 465 S.W.3d 168, 178 (Tex. 2015)).

### B. The Evidence Was Sufficient to Support the Jury's Verdict

Appellants contend they established as a matter of law that Appellees breached their fiduciary duty to the corporation. Appellants' argument is premised on the theory that there was no valid agreement that justified Appellees' transfer of a portion of NOS's interest in TimRon to themselves. Appellants state that the only written agreement among shareholders was the preformation agreement, which did not allow for such a transfer, and the lack of any other written shareholders agreement established, then, that Appellees' actions were breaches of their fiduciary duties.

As discussed above, however, Appellees' position was that the transfer of the TimRon shares to themselves was in accordance with an agreement to equalize interests in future businesses made between the controlling shareholders in 1998. Because Tim's and Ronnie's employment agreements were nonexclusive per the terms of the preformation agreement, they could have formed any other businesses they wanted to, and without the agreement to equalize,

28

they would have gone on without including the initial investors. Further, as discussed above, Appellants did not establish that such agreement was required to be in writing.

Each of the Appellees testified that the principal shareholders in NOS agreed to equalize interests in new companies formed after NOS. Hutchison wrote to Young about the 1998 agreement in 2018. Testimony and evidence corroborated the majority shareholders' agreement, as they later equalized interests in Network Holding, NetIP, and Encompass prior to equalizing their interest in TimRon. In addition, Appellees testified that they would never have transferred TimRon to NOS but for the oral agreement to equalize interests in TimRon.

In addition to testifying about the oral agreement, Hutchinson testified that, after the Suddenlink deal fell through, Appellees were attempting to continue to build value in TimRon by expanding into Shreveport. That expansion involved additional financing personally guaranteed by Appellees, which included lines of credit of about $7 million. The NOS 2015 board resolution making the transfer of NOS shares to Appellees effective recognized Appellees' personal guarantees of "all debt of NOS." Further, the jury heard testimony that, after the $32 million Suddenlink sale fell through, Conterra bought TimRon for $48 million, with the increased value being "directly related to the Shreveport investment."

Conversely, the jury heard testimony that Appellants' involvement in NOS and the related companies was very limited. Appellants each testified that, from the 1987 preformation agreement until their father's death in 2013, they had no knowledge of the corporation or involvement with its business dealings. Mark never loaned the corporation money. Other than knowing his father intended to leave a legacy to his sons, Richard said he did not know about

29

NOS until the sale of TimRon in 2018. Richard testified he never engaged in any efforts to further the business of the company. Jeff testified generally that he was not involved with NOS at all.

Crediting all evidence in the light most favorable to the jury's verdict, we conclude a reasonable jury could have reached the determination that Appellees did not breach their fiduciary duties to NOS in transferring a portion of NOS's interest in TimRon to themselves. Thus, the trial court did not err in denying Appellants' motion for judgment to disregard the jury's verdict.

We overrule Appellants' first issue.

## V.      Motion for Summary Judgment

In their fourth issue, Appellants argue that the "trial court erred in granting, in part, [Appellees'] Motion for Summary Judgment." Appellees moved for traditional and no-evidence summary judgment on all claims pled by Appellants. The trial court denied Appellees' motion as to Appellants' derivative claims for breach of fiduciary duty, which proceeded to trial. The trial court granted the motion as to all Appellants' remaining claims, including their individual claims for breach of fiduciary duty and breach of contract and all derivative claims pleaded for civil theft, conversion, fraud, constructive trust, and money had and received. Appellants claim specifically that the trial court erred in granting Appellees' motion for summary judgment on Appellants' claims in their individual capacities for breach of fiduciary duty and breach of contract as well as their derivative claims for civil theft, conversion, and money had and received.

30

## A.    Standard of Review and Applicable Law

"We review summary judgments de novo, taking as true all evidence favorable to the nonmovant, and indulging every reasonable inference and resolving any doubts in the nonmovant's favor." *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 509 (Tex. 2022).

Summary judgment is appropriately granted on a traditional motion when a movant shows "there is no genuine issue . . . [of] material fact" and it "is entitled to judgment as a matter of law." TEX. R. CIV. P. 166a; *see Energen Res. Corp.*, 642 S.W.3d at 509. If the movant satisfies this burden, the burden then shifts to the nonmovant to produce evidence that raises a genuine issue of material fact to avoid summary judgment. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 51 (Tex. 2014). If the movant does not "conclusively establish[] its cause of action or defense," "[t]he nonmovant has no burden to respond." *Energen Res. Corp.*, 642 S.W.3d at 509 (alteration in original) (quoting *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222–23 (Tex. 1999)).

In a no-evidence motion for summary judgment, alleging that adequate time for discovery has passed, a movant claims that the nonmovant has failed to produce any evidence to support "one or more essential elements of a claim" for which the nonmovant would bear "the burden of proof at trial." TEX. R. CIV. P. 166a(i). The burden then shifts to the nonmovant to present evidence that raises a genuine issue of material fact as to each element specified in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The trial court must grant a no-evidence motion for summary judgment unless the nonmovant "produces summary

31

judgment evidence raising a genuine issue of material fact." TEX. R. CIV. P. 166a(i). We will sustain a no-evidence summary judgment when:

> (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

*Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013) (quoting *King Ranch*, 118 S.W.3d at 751).

### B.      Individual Claims for Breach of Contract

With respect to Appellants' individual breach of contract causes of action, they claim on appeal only that the motion was "fatally defective." Specifically, Appellants claim Appellees' no-evidence motion for summary judgment on Appellants' individual claims for breach of contract did not state with specificity which elements of the breach of contract cause of action lacked supporting evidence.

Appellees' motion for summary judgment was styled as a no-evidence and traditional motion for summary judgment, brought under both subsections (b) and (i) of Rule 166a of the Texas Rules of Civil Procedure. *See* TEX. R. CIV. P. 166a(b), (c), (i). While "[t]he rules do not prohibit such a hybrid motion," "the better practice is either to file two separate motions . . . or to file one document containing both motions but with the arguments and authorities for each clearly delineated and separate from one another." *Grant v. Sw. Elec. Power Co.*, 20 S.W.3d 764, 768 (Tex. App.—Texarkana 2000), *aff'd in part and rev'd in part*, 73 S.W.3d 211 (Tex. 2002). Such a delineation would be "helpful to the bench and bar," but is not required by the

32

rules, if the "motion clearly sets forth its grounds and otherwise meets Rule 166a's requirements." *Binur v. Jacobo*, 135 S.W.3d 646, 651 (Tex. 2004).

A no-evidence motion for summary judgment "must state the elements as to which there is no evidence." TEX. R. CIV. P. 166a(i). "As a matter of law, a no-evidence motion that states only a general challenge to the non-movant's case or only challenges 'one or more' of the claim's elements while failing to state which specific elements allegedly lack supporting evidence is fundamentally defective and cannot support summary judgment." *Bryant v. May*, No. 06-17-00115-CV, 2018 WL 2708531, at *3 (Tex. App.—Texarkana June 6, 2018, no pet.) (mem. op.) (quoting *Jose Fuentes Co. v. Alfaro*, 418 S.W.3d 280 (Tex. App.—Dallas 2013, pet. denied)).

Here, it is unclear whether Appellees moved for traditional or no-evidence summary judgment on Appellants' individual breach of contract claims, or both. Appellees stated Appellants "have not pled a viable cause of action," the preformation agreement was completed and had been extinguished by the creation of NOS and adoption of its bylaws, the preformation agreement did not create any separate duties owed between the parties individually, Tim and Ronnie had no individual duty to Appellants under the preformation agreement, and Hutchison was not even a party to the contract. These assertions of law and fact form the basis of a traditional motion for summary judgment. However, in the middle of the only paragraph seeking summary judgment specifically on the individual breach of contract claim, Appellees also allege, "Even assuming arguendo, the Court believes that Plaintiffs have alleged a Cause of Action for

33

themselves individually against the individual Defendants they have produced zero evidence to show a breach by the individual Defendants."

Even though Appellees' motion could have been drafted in a more cogent manner, by the one statement referenced above, they clearly asserted that Appellants had no evidence to demonstrate the breach element of breach of contract. *See, e.g.*, *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018) (recognizing the elements of a breach of contract cause of action as (1) the existence of a valid contract, (2) performance or tender thereof, (3) breach, and (4) damages). The trial court thus did not err in granting summary judgment on the breach of contract claim due to the alleged defective pleading of the no-evidence motion.[12]

## C.    Individual Claims for Breach of Fiduciary Duty

Appellants further claim the trial court erred in granting Appellees' motion for summary judgment on their individual claims for breach of fiduciary duty. Appellants urge they had standing to bring individual claims for breaches of fiduciary duties by Appellees because Appellees' conduct breached specific duties Appellees owed to them through the preformation agreement and NOS's bylaws.

Both parties here recognize the general rule that an individual shareholder does not have an independent cause of action for breach of fiduciary duty against directors and officers of a

---

[12]Further, the trial court may have granted traditional summary judgment on Appellants' individual breach of contract claims, rather than no-evidence summary judgment, as it did not specify in its order whether it was granting the motion on the traditional or no-evidence grounds. We must affirm summary judgment "if any of the grounds on which judgment [wa]s sought are meritorious." *Merriman*, 407 S.W.3d at 248. Appellants have not challenged the granting of traditional summary judgment on their individual breach of contract claims; thus, they have waived this argument on appeal. *See* TEX. R. APP. P. 38.1(f).

corporation because directors and officers owe fiduciary duties to the corporate entity rather than to the entity's shareholders. *See, e.g.*, *Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 476 (Tex. 2022) (citing *Ritchie*, 443 S.W.3d at 869); *Faour v. Faour*, 789 S.W.2d 620, 622 (Tex. App.—Texarkana 1990, writ denied). Appellants urge, however, that applicable here is an exception to that general rule, which applies "when the conduct in question breaches a specific duty owed by the actor to the individual shareholder, such as when the conduct gives rise to a breach of contract claim." *See Ritchie*, 443 S.W.3d at 888 n.55; *Faour*, 789 S.W.2d at 621–22 ("A corporate officer owes a fiduciary duty to the shareholders collectively, i.e. the corporation, but he does not occupy a fiduciary relationship with an *individual* shareholder, unless some contract or special relationship exists between them in addition to the corporate relationship.").

In their motion for summary judgment, Appellees argued Appellants had no individual claims for breach of fiduciary duty because no informal fiduciary duty arose from the family relationship between them. In response, and again on appeal, Appellants argue that a duty was established through the preformation agreement's requirement that NOS's profits were to "be divided between the [shareholders] in accordance with their . . . percentage of ownership." Similarly, Appellants claim the bylaws of the corporation also required that dividends be paid. Appellants claim those provisions in the preformation agreement and the bylaws established a fiduciary duty to them, individually, which Appellees breached by failing to pay them dividends and by stealing a portion of their interest in TimRon.

35

We do not agree that a fiduciary duty existed between Appellees and Appellants in their individual capacities. The Texas Supreme Court has recently held that a corporation's director cannot simultaneously owe a fiduciary duty to the corporation and an informal fiduciary duty to a shareholder. *In re Est. of Poe*, 648 S.W.3d at 288. Further, as stated above, generally, corporate directors and officers owe fiduciary duties to the corporate entity, not to the entity's individual shareholders. *Petrobras Am. Inc.*, 650 S.W.3d at 476. While the preformation agreement may have created certain contractual duties among the individual shareholders, *see, e.g.*, *Aloysius v. Kislingbury*, No. 01-13-00147-CV, 2014 WL 4088145, at *4 (Tex. App.—Houston [1st Dist.] Aug. 19, 2014, no pet.) (mem. op.), it did not create a separate fiduciary duty the breach of which might have formed the basis for a claim separate and apart from Appellants' individual breach of contract claim based on that agreement.

Likewise, we do not agree that the NOS bylaws created a fiduciary duty. Appellants do not cite any authority for the creation of a fiduciary duty through language such as that from the bylaws here, which state that the board of directors might, in its discretion, declare dividends after, at its discretion, setting aside a reserve fund for meeting contingencies, equalizing dividends, or repairing or maintaining corporate property. Finally, "to recover individually, a stockholder must prove a personal cause of action and personal injury." *Id.* at *3 (quoting *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990)); *see Faour*, 789 S.W.2d at 623. Any injury to Appellants based on Appellees' alleged failure to adhere to the NOS bylaws would be an injury common to all stockholders, not personal to any Appellant. The trial court did not err in granting summary judgment on Appellants' individual claims for breach of fiduciary duty.

36

**D.**     **Civil Theft, Conversion, and Money Had and Received**

Next, Appellants claim the trial court erred in granting summary judgment as to their derivative claims for civil theft, conversion, and money had and received.  Appellees respond that the jury's findings rendered moot Appellants' claims of trial court error in granting summary judgment on those causes of action.  We agree, and Appellants concede in their reply brief that our affirmance of the judgment renders those issues moot.

We overrule Appellants' fourth issue.

**VI.**     **Conclusion**

We affirm the judgment of the trial court.


                    Charles van Cleef
                    Justice


Date Submitted:     January 22, 2025
Date Decided:     March 21, 2025